MOLLY M. WHITE, Cal. Bar No. 171448
E-mail: whitem@sec.gov
FINOLA H. MANVELIAN, Cal. Bar No. 180681
E-mail: manvelianf@sec.gov
MARSHALL SPRUNG, Cal. Bar No. 188253
E-mail: sprungm@sec.gov
JUNLING MA, Cal. Bar No. 213241
E-mail: maj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind Tyson, Acting Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>BROADCOM CORPORATION,<br><br>Defendant. | Case No. SACV08-00430 JVS (RNBx)<br><br>**COMPLAINT** |

1.  This matter involves improper stock option backdating at Broadcom Corporation ("Broadcom" or the "Company"), which resulted in the Company's issuance of false financial statements that concealed from shareholders billions of dollars in stock-based compensation expenses.

2.  Under well-settled accounting principles in effect throughout the relevant period, Broadcom was not required to record an expense in its financial

statements for options granted to employees at the market price ("at-the-money"), but *was* required to record expenses for any options granted below the current market price ("in-the-money"). From June 1998 through May 2003, to help recruit and retain employees with potentially far more lucrative "in-the-money" options, Broadcom systematically backdated employee and officer stock options to coincide with the dates of low closing prices for the Company's common stock without properly recording the compensation expenses associated with such options. In January 2007, Broadcom restated its financial results for the years 1998 through 2005 and reported an additional $2.22 billion in previously unrecorded net non-cash compensation expenses.

3. The backdating scheme at Broadcom was orchestrated and carried out by Broadcom's most senior executives, including its co-founder and former chief executive officer, its co-founder and chairman and chief technical officer, its former chief financial officer, its general counsel, and its former director of human resources.

4. As a result of the acts alleged in this Complaint, Broadcom violated the antifraud provisions of the federal securities laws, falsified books and records, and falsely reported its financial results. The Commission seeks an order enjoining Broadcom from future violations of the securities laws, requiring it to pay a civil monetary penalty, and providing other appropriate relief.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa. The defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of

business alleged in this Complaint.

6. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The transactions, acts, practices, and courses of conduct constituting violations of the laws alleged in this Complaint occurred within the Central District of California, and the defendant may be found in this district.

## DEFENDANT

7. Broadcom Corporation is a California corporation headquartered in Irvine, California. Broadcom designs, develops, and supplies semiconductors for wired and wireless communications markets. At all relevant times, Broadcom's common stock was registered under Section 12(g) of the Exchange Act and was traded on the Nasdaq National Market under the symbol "BRCM." Broadcom conducted an initial public offering on April 17, 1998.

## FACTS

### A. Broadcom Misrepresented Its Option Program

8. After Broadcom went public in April 1998, it experienced tremendous growth, expanding from approximately 300 employees in 1998 to about 3000 employees in 2002. Broadcom operated in the highly competitive high-tech market, where recruiting and retaining talented employees was a top priority. Another priority, as set forth by Broadcom's two founders, was to preserve cash. To preserve cash, Broadcom maintained a ceiling of $110,000 annual cash salary for most employees and officers during the relevant period. As a result, Broadcom relied heavily on stock options to recruit and retain employees.

9. Each stock option gave the grantee the right to buy one share of Broadcom's stock from the Company at a set price, called the "exercise" price or "strike" price, on a future date, after the option had vested. The option was "in-the-money" whenever the trading price of Broadcom's common stock exceeded the option's exercise price. The option was "at-the-money" whenever the trading

price of Broadcom's common stock and the exercise price were the same. The option was "underwater" or "out-of-money" whenever the trading price of Broadcom's common stock was less than the exercise price.

10. From June 1998 through May 2003, Broadcom granted both annual and periodic options to its employees and officers under its stock option plans. Before 2000, Broadcom awarded annual grants to employees on or about the anniversary date of their employment. Beginning in 2000, annual options were awarded to most eligible employees, and were referred to as "focal" grants. Periodic options were also awarded to selected employees. These option grants included new hire grants, performance and promotion grants, patent grants, and "top-up" grants that were made in connection with acquisitions.

11. During the relevant period, Broadcom's stated practice was to grant all stock options with an exercise price that purportedly matched the fair market value of the Company's stock on the grant date.

12. Throughout the relevant period, Broadcom's public filings affirmatively stated that the Company accounted for its employee stock options pursuant to Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"). Under APB 25 and the accounting rules in effect from 1998 through June 2005, a public company was allowed to grant stock options to employees without recording a compensation expense so long as the options were granted at-the-money. However, if a company granted "in-the-money" options, the company was required to record as an expense on its financial statements the difference between the exercise price and the quoted market price on the "measurement date" over the vesting period of the options. The measurement date, as defined by APB 25, is the first date on which the following information is known: (i) the number of options that an individual employee is entitled to receive, and (ii) the exercise price. The stock options that Broadcom granted to its employees typically had a vesting period of four years, during which
-4-

1 | time a proportion of the option shares became exercisable periodically.
2 | Consequently, granting in-the-money options to employees could have had a
3 | significant impact on the expense and income (or loss) reported to Broadcom's
4 | shareholders.
5 |     13.   Broadcom disclosed its accounting for stock options in the notes to its
6 | audited financial statements included in its annual reports to shareholders, filed
7 | with the Commission on Form 10-K, for its fiscal years 1998 through 2005. In
8 | these annual reports, Broadcom did not record expenses for the backdated stock
9 | options. In addition, Broadcom's proxy statements (which were sent to
10 | shareholders) for the fiscal years 1999 through 2003 stated that options awarded to
11 | its executive officers were granted at the market price on the date of the grant. The
12 | disclosure regarding the employee stock option program in these public filings was
13 | also false and misleading.

**B.   The Backdating Scheme At Broadcom**

15 |     14.   During the relevant period, Broadcom granted stock options to its
16 | employees and officers, including executives who fell within the definition of
17 | "officer" under Rule 16a-1(f) of the Exchange Act, 17 C.F.R. § 240.16a-1(f)
18 | ("Section 16 officers"). Option grants to employees and non-Section 16 officers
19 | were supposed to be approved by a two-member option committee comprised of
20 | the former CEO and the current chief technical officer. Grants to Section 16
21 | officers were supposed to be approved by a compensation committee comprised of
22 | two independent board members. Notwithstanding the distinction between the two
23 | committees, the two option committee members in effect determined option grants
24 | for all employees, including Section 16 officers.
25 |     15.   Option committee and compensation committee approval of option
26 | grants was documented by unanimous written consents ("UWCs") that approved
27 | grants "effective as of" a specified date. The UWCs, however, were usually
28 | prepared weeks or months after the "as of" date. The UWCs typically referred to

an attached schedule that listed the names of the grantees and the number of shares subject to each option. The schedules were usually prepared long after the "as of" date, and were sometimes changed even after that.

16. From June 1998 through May 2003, the option committee purportedly approved as many as 88 option grants. But for many of these grants, there were no option committee "meetings" or decisions made on the purported grant dates. Instead, the former CFO retroactively determined the grant dates after reviewing a list of Broadcom's closing stock prices over a ranging time period. During the relevant period, the CFO received "menu" emails from the Company's stock administrator, in which the stock administrator provided a list of historical closing prices for several previous Fridays (the day the option committee purportedly held meetings) and inquired whether the option committee had met and approved option grants on any of the listed dates. The "menu" emails allowed the CFO to easily "look back" and pick the lowest strike price for the period. The CFO invariably responded to the stock administrator's requests by confirming that the option committee had met to approve options on a date with the lowest corresponding stock price.

17. During the relevant period, the two option committee members signed UWCs that falsely memorialized that options were granted "as of" the selected grant dates, even though they knew there was no option committee meeting or decision to grant options on the stated dates and that the terms of the grants had not been finalized on those dates.

C. **Backdated Company-Wide Option Grants**

 1. **May 26, 2000 Grant**

18. Broadcom made its first company-wide, or "focal," grant purportedly on May 26, 2000, at an exercise price of $118.38 per share, the lowest closing price for Broadcom stock between October 1999 and October 2000. The May 26, 2000 grant date was selected on or about May 30, 2000, but it took months for

Broadcom to allocate options to individual employees. The delay caught the attention of Broadcom's auditors in late July 2000, when Broadcom's stock price had risen from $118 per share to well over $200. According to Broadcom's manager of financial reporting, who was the Company's primary contact with the auditors, the auditors were concerned about the "measurement date" of the grant, and took the position that Broadcom needed to know how many shares were granted to each employee to actually set the "measurement date" for accounting purposes. On July 20, 2000, the CFO emailed the CEO that the auditors were "making noises that we will have to take a compensation hit ... of over $700M! Obviously we are not about to let this happen...."

19. After intense discussions with the auditors, the auditors ultimately signed off on the May 26, 2000 grant without insisting that Broadcom record a compensation charge. However, from September 2000, all senior officers involved in the option granting process knew, or were reckless in not knowing, that allocating options to individual employees after a grant date had been determined would trigger accounting consequences. Nevertheless, Broadcom continued the improper practice of subsequent allocation through May 2003, and never took any compensation charge associated with such option grants.

### 2. Backdated 2001 Grants

20. From late 2000, Broadcom's stock price declined substantially, causing many employee stock options to be "underwater." To address employee concerns, Broadcom conducted a tender offer in May 2001 to allow employees to exchange their underwater options for new options to be issued between December 24, 2001 and January 31, 2002. Employees had to decide whether to take part in the tender offer by June 23, 2001. On June 24, 2001, after the tender offer period closed, Broadcom granted options to those employees who declined to participate in the tender offer. This grant, however, did not include options to many officers, because the former CEO delayed for months in completing allocation of options to

his direct reports, including several Section 16 officers. Consequently, Broadcom made two additional grants purportedly on October 1 and October 19, 2001. Broadcom then granted options to employees who participated in the tender offer purportedly on December 24, 2001. However, these three grant dates were false, and the options were actually granted at a later time and then backdated to reflect the earlier date.

21. The October 1, 2001 grant date was selected by the former CFO around November 2, 2001. The October 1, 2001 closing price for Broadcom stock, $18.77, which was used as the exercise price, was Broadcom's lowest closing price in 2001. Later in November and December 2001, Broadcom also seized the low $18.77 exercise price to award a substantial number of special options to two groups of employees: (i) top performers, and (ii) those employees whose existing options would be fully vested in the next two years.

22. The October 19 and December 24, 2001 grant dates were selected on January 4, 2002 after discussions between the two option committee members and other senior officers. The December 24, 2001 closing price of $39.75 was the lowest price for Broadcom stock during the entire re-grant window of December 24, 2001 and January 31, 2002.

23. The purported October 19 and December 24, 2001 grants included options to Section 16 officers, which required the approval of the compensation committee. There was no meeting of the compensation committee to approve any grant on the purported grant dates. In fact, the compensation committee was not even legally constituted during this period, because one of the two requisite members of the committee died in July 2001, and his replacement was not appointed until March 2002. At the direction of Broadcom's general counsel, false board and compensation committee UWCs were prepared and used to conceal the backdating of the grants, including a false board UWC dated as of "October 12," 2001 to appoint the replacement member to the compensation committee, just in

time to approve the October 19 and December 24 grants.

### 3. 2002/2003 Focal Grant on July 3, 2002

24. In March 2002, Broadcom's stock price began a steady decline. The 2002 annual, or "focal," grant process had started in the spring of 2002. By mid-May, the director of human resources sent several emails stating that the option committee had met and approved focal grants on May 10, 2002 at $24.54, which was then the lowest price since October 2001. This grant date was abandoned after the stock price dropped even further. In mid-June 2002, one of the option committee members suggested that Broadcom take advantage of "a favorable strike price" and grant 2003 focal options at the same time as the 2002 grant, hence making it a "double focal" grant. This idea was "killed" by the former CFO in early July but later "revived." Broadcom granted the "double focal" options to purchase in the aggregate more than 31.5 million shares of Broadcom stock purportedly on July 3, 2002 at an exercise price of $15.74. The date was selected retroactively by the CFO on or about July 16, 2002. The July 3, 2002 price of $15.74 was the second lowest closing price for Broadcom's stock between January 1, 2002 and September 5, 2002.

25. The process for allocating individual options for the 2003 focal portion of the "double focal" grant did not resume until after July 16, 2002, and was not completed until August 2002. During this period, the director of human resources complained that she had to meet in person with all business units about the allocation because the CFO did not want her to "communicate anything in writing since it would leave an email trail of unfavorable dates."

### 4. The May 19, 2003 Focal Grant

26. Broadcom granted focal options to newly hired employees who did not participate in the 2002/2003 "double focal" grant with a purported grant date of May 19, 2003 at an exercise price of $20.00. The approval of the purported May 19, 2003 grant did not occur until June 5, 2003, when Broadcom's stock closed at

1 | $26.66.

### D. Backdated Grant to New-Hire and Hiring Through Acquisitions

27. In June 1999, in an effort to recruit one engineer, the CEO offered the engineer backdated, in-the-money options to acquire 120,000 shares of Broadcom stock at an exercise price of $88.375, which was the closing price on May 25, 1999. The engineer, however, did not begin working at Broadcom until June 28, 1999. On that date, Broadcom's stock closed at $118. The new-hire's offer letter and personnel files were falsified to reflect the backdated date.

28. During 2000, Broadcom senior officers deployed a deceptive method to recruit "key" employees with lucrative options – hiring through acquisition targets. Broadcom made numerous acquisitions in 2000. The acquisition targets were typically start-up companies whose stock was comparatively cheap. Hiring through such targets allowed Broadcom to promise prospective employees options to purchase the target's stock that, once the acquisition was completed, would be enormously in-the-money. Broadcom directed the acquisition target to hire Broadcom's candidates on Broadcom's terms after the signing of a definitive agreement. Because the new hires never really worked for the target company, employment and personnel records were falsified to effect the hiring and granting of options by the target.

29. One example of the deceptive practice involved the hiring of Broadcom's chief information officer in August 2000. On August 9, 2000, Broadcom signed an agreement to acquire a start-up company called Newport Communications, Inc. ("Newport"). At the same time that Broadcom was negotiating the acquisition, Broadcom had been trying to recruit a candidate for the position of chief information officer at Broadcom. To make Broadcom's compensation package attractive to the recruit, the CFO offered the candidate options in Newport stock which, upon completion of the acquisition, would be in-the-money by $12 million. The candidate accepted the offer, and received an

August 25, 2000 offer letter from Newport that included options to acquire 600,000 shares of Newport stock. The recruit, however, never worked for Newport, and reported directly to Broadcom.

30. By bringing in the candidate through Newport, Broadcom concealed the grant of a large amount of in-the-money options to the new hire. Although Broadcom recorded an expense for the options that the new hire had received from Newport, the expense was recorded as acquisition-related deferred compensation, and not as a compensation expense associated with in-the-money options.

### E. **Broadcom Falsely Reported Its Financial Results and Materially Misrepresented Its Stock Option Program**

31. As a public company, Broadcom filed with the Commission periodic reports and other filings, including annual reports that included audited financial statements, which were certified by the Company's outside auditors. From June 1998 through May 2003, by repeatedly backdating its option grants, Broadcom granted in-the-money options, but Broadcom never recorded a compensation expense for such options. As a result, Broadcom made false and misleading disclosures regarding its operating results and option grants in its public filings, including its periodic reports on Forms 10-K, 10-Q, and 8-K, its proxy statements, and its registration statements.

#### 1. **Forms 10-K, 10-Q, and 8-K**

32. The backdating scheme caused each of Broadcom's annual reports on Form 10-K for fiscal years 1998 through 2003, and each of its quarterly reports on Form 10-Q for the same period, to materially understate Broadcom's stock-based compensation expenses. This, in turn, caused Broadcom to overstate its net income or to understate its net loss, and to overstate its earnings per share and profit margin. Broadcom's Forms 10-K and 10-Q for fiscal years 2004 and 2005 contain materially false and misleading financial statements and results because, in part, they contain, to varying degrees, materially false and misleading historical

financial statements from fiscal years 1998 through 2003. Broadcom's materially misstated operating results also were featured in Broadcom's earnings releases to the market, which were filed with the Commission in Forms 8-K during the relevant period.

33.  On January 23, 2007, Broadcom restated its financial results for the years 1998 through 2005 to record an additional $2.22 billion of compensation expense associated with backdated stock options. The impact of the restatement on Broadcom's operating income during the relevant period was as follows:

| Fiscal Year Ended 12/31 | Broadcom's Operating Income (Loss) As Originally Stated | Unrecognized Compensation Expense | Percentage By Which Operating Income (Loss) Was Overstated (Understated) |
|---|---|---|---|
| 1998 | $35,660,000 | $11,770,000 | 49.3% |
| 1999 | $92,653,000 | $74,927,000 | 422.7% |
| 2000 | ($713,381,000) | $442,326,000 | (38.3%) |
| 2001 | ($2,790,921,000) | $916,879,000 | (24.7%) |
| 2002 | ($1,918,415,000) | $374,337,000 | (16.3%) |
| 2003 | ($967,619,000) | $334,006,000 | (25.7%) |
| 2004 | $272,025,000 | $65,085,000 | 31.5% |
| 2005 | $336,837,000 | $44,640,000 | 15.3% |
| Total | ($5,653,161,000) | $2,263,970,000 | (28.6%) |

34.  Broadcom's failure to account for compensation expenses associated with the granting of stock options led Broadcom to overstate its gross profit by 13% for 2001, 4% for 2002, and 4% for 2003. The Company's failure to account for compensation expenses also caused Broadcom to understate its net loss per share (basic and diluted) by 25% for 2001, 20% for 2002, and 26% for 2003, and to overstate its net income per share by 28% (basic) or 27% (diluted) for 2004, and 13% (basic) or 11% (diluted) for 2005.

35.  In addition, in its annual and quarterly reports on Forms 10-K and 10-Q for fiscal year 2000, Broadcom reported compensation expenses for options that Broadcom's acquisition targets granted to new-hires at Broadcom's direction and on its behalf. The Forms 10-K and 10-Q, however, did not disclose Broadcom's deceptive practice of hiring through the acquisition targets. The Forms 10-K and 10-Q also reported the compensation liability as acquisition-related deferred

compensation, not as compensation expense associated with in-the-money options.

### 2. Proxy Statements

36. Broadcom sent shareholders proxy statements in connection with its annual shareholder meetings from 1999 through 2003, and for a special shareholder meeting in October 1999. In the proxy statements for the shareholder meetings for the years 2001 through 2003 and for the 1999 special shareholder meeting, Broadcom solicited shareholder approval of annual amendments to its 1998 Incentive Stock Plan to increase the number of shares reserved for issuance under the Plan.

37. Each of the proxy statements falsely represented that options to Broadcom's executive officers were granted at the market price on the date of the grant. The proxy statements for the shareholder meetings for the years 2001 through 2003 and for the 1999 special shareholder meeting falsely disclosed the date of option grants to its named executive officers, which were incorporated by reference into the Company's annual reports on Form 10-K. The proxy statements also represented that the compensation committee had exclusive authority to grant options to Section 16 officers, when in fact the two founders and the CFO decided when and how many options to award. In addition, while the proxy statements described that in-the-money options would result in the Company taking a compensation expense, the proxy statements were materially misleading because they failed to disclose that Broadcom routinely ignored this treatment of its stock options.

### 3. Registration Statements

38. From June 1998 through 2005, Broadcom filed various registration statements with the Commission, including one on Form S-1, four on Forms S-3, one on Form S-4, and 21 on Forms S-8. These registration statements were filed primarily in connection with Broadcom's acquisitions of other companies. These registration statements included and/or incorporated by reference the consolidated

financial statements and the misrepresentations in Broadcom's Forms 10-K, 10-Q, and 8-K, and Broadcom's proxy statements for the same period. In addition, Broadcom conducted tender offers in 2001 and 2003. The tender offer documents contained misleading statements regarding the 1998 Stock Option Plan. In particular, the tender offer documents stated that in-the-money options pursuant to the Plan would result in the Company taking a compensation expense, but they did not disclose that Broadcom routinely ignored that treatment of its stock options. The tender offer documents also incorporated the false financial statements included in Broadcom's Forms 10-K for the period.

### 4. False Books and Records at Broadcom

39. During the relevant period, Broadcom's option committee members signed false UWCs approving backdated option grants. Broadcom's employees from the finance and shareholder services departments relied on the false UWCs to record option grants into the Company's books and records, and to prepare Broadcom's financial results and public filings. As a result of the backdating of option grants, Broadcom's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the Company's stock-based compensation expenses, the Company's operating results, and at least one employee's hire date.

40. Broadcom also provided the "as of" dated UWCs as documentation of its stock option grants to Broadcom's external auditors in connection with their audits of Broadcom's financial statements.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### Violations of Section 17(a) of the Securities Act

41. The Commission realleges and incorporates by reference ¶¶ 1 through 40 above.

42. Broadcom, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

    a.    with scienter, employed devices, schemes, or artifices to defraud;

    b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

43. By engaging in the conduct described above, Broadcom violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE
## PURCHASE OR SALE OF SECURITIES
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder

44. The Commission realleges and incorporates by reference ¶¶ 1 through 40 above.

45. Broadcom, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

        b.        made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

        c.        engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

46.    By engaging in the conduct described above, Broadcom violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF COMMISSION PERIODIC REPORTING REQUIREMENTS
### Violations of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder

47.    The Commission realleges and incorporates by reference ¶¶ 1 through 40 above.

48.    By filing with the Commission materially false and misleading periodic reports, including annual, quarterly, and current reports on Forms 10-K, 10-Q, and 8-K for the fiscal years from 1998 through 2005, Broadcom violated, and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

## FOURTH CLAIM FOR RELIEF
## RECORD KEEPING VIOLATIONS
### Violations of Section 13(b)(2)(A) of the Exchange Act

49. The Commission realleges and incorporates by reference ¶¶ 1 through 40 above.

50. By failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets, Broadcom violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

## FIFTH CLAIM FOR RELIEF
## INTERNAL CONTROLS VIOLATIONS
### Violations of Sections 13(b)(2)(B) of the Exchange Act

51. The Commission realleges and incorporates by reference ¶¶ 1 through 40 above.

52. By failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets, Broadcom violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

## SIXTH CLAIM FOR RELIEF
## PROXY VIOLATIONS
### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder

53. The Commission realleges and incorporates by reference ¶¶ 1 through 40 above.

54. Broadcom, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, knowingly, recklessly or negligently, solicited proxies by means of a

proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

55. By engaging in the conduct alleged above, Broadcom violated, and unless restrained and enjoined will continue to violate, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

(a) Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

(b) Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Broadcom, its agents, servants, employees, attorneys, and those persons in active concert or participation with them, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a), and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9.

(c) Order Broadcom to pay a civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and/or Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

(d) Retain jurisdiction of this action in accordance with the principles of

1 equity and the Federal Rules of Civil Procedure in order to implement and carry
2 out the terms of all orders and decrees that may be entered, or to entertain any
3 suitable application or motion for additional relief within the jurisdiction of this
4 Court.
5     (e)    Grant such other and further relief as this Court may determine to be
6 just and necessary.

7 DATED: April 22, 2008

                                              JUNLING MA
                                              Attorney for Plaintiff
                                              Securities and Exchange Commission